UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RYAN LEE ESLICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:22-cv-02415-TWP-KMB |
| ) | |
| DENNIS REAGLE, ) | |
| JACK HENDRIX, ) | |
| T. GREATHOUSE, ) | |
| AMBER VCKOV, ) | |
| GOODNIGHT, ) | |
| T. SOLOMON, ) | |
| ) | |
| Defendants. ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Dennis Reagle ("Mr. Reagle"), Jack Hendrix ("Mr. Hendrix"), T. Greathouse ("Mr. Greathouse"), Amber Vckov ("Ms. Vckov"), Goodnight ("Mr. Goodnight"), and T. Solomon ("Mr. Solomon") (collectively, "Defendants") (Dkt. 94). Plaintiff Ryan Lee Eslick ("Mr. Eslick"), an inmate in the custody of the Indiana Department of Correction, filed an Amended Complaint alleging the Defendants violated his Fourteenth Amendment Rights when they denied him regular and meaningful review of his placement in restricted housing (Dkt. 82). For the reasons explained below, summary judgment is **granted**.

### I.  STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to

the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A court has only to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

If a party contends that a fact is undisputed or is genuinely disputed, the party must support its assertion by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to support a fact in opposition to a movant's factual assertion properly can result in the movant's fact being considered undisputed, and potentially, in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.     BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Eslick and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A.     The Parties

At all relevant times, Mr. Eslick was an inmate in the custody of the Indiana Department of Correction ("IDOC") (Dkt. 95-1 at 10-11).

Mr. Greathouse was the unit team manager at Pendleton Correctional Facility ("Pendleton") from approximately January 2021 through January 2022 (Dkt. 95-2 at 6, 9, 10). Mr.

Reagle was the warden at Pendleton from August 2020 through February 2024, where his responsibilities included classification and movement issues (Dkt. 95-3 at 6–7). Ms. Vckov was a caseworker at Pendleton from September 2021 through 2022 (Dkt. 95-4 at 1–2). Mr. Goodnight was a caseworker at Pendleton from March 2022 until January 2024 (Dkt. 95-5 at 1). Mr. Solomon was a correctional caseworker for two years before he became a correctional officer at Pendleton in January 2024 (Dkt. 95-6 at 4). Mr. Hendrix was the IDOC director of classification from 2011 through July 1, 2024 (Dkt. 95-7 at 3–4).

This case involves two periods that Mr. Eslick was in Administrative Department-Wide Restricted Housing ("DWRH-A") at Pendleton. The first period was from late January 2018 to early February 2019. The second period was November 2021 to April 2023 (for a cumulative total of about 30 months). Outside of those two periods, Mr. Eslick was housed in Disciplinary Department-Wide Restricted Housing ("DWRH-D") at Westville Correctional Facility ("Westville"). Consequently, Mr. Eslick was in restricted housing for an alarming period of over seven years. None of the Defendants in this action were employed at Westville during the relevant period, so the Court addresses Mr. Eslick's housing at Westville only to supply context to the facts pertinent to his claims against the Defendants. Similarly, the Court considers the involvement of non-party Pendleton personnel in Mr. Eslick's classification reviews because the frequency and meaningfulness of the reviews he received from the Defendants must be considered in the context of all the undisputed facts.

B.  **Administrative Department-Wide Restricted Housing**

Within IDOC, there are four types of restrictive housing: Administrative Restricted Housing, Disciplinary Restricted Housing, Administrative Department-Wide Restricted Housing, and Disciplinary Department-Wide Restricted Housing (Dkt. 95-7 at 18).

At all relevant times, IDOC maintained a policy regarding administrative restrictive status housing (Dkt. 95-4 at 7). IDOC Policy #02-01-111 "Administrative Restrictive Housing" states:

> Administrative Restrictive housing units may be operated at the facility level, or on a department-wide basis. The admittance of an offender to an adult administrative restrictive status housing unit shall be based on the:
>
> - Threat an offender's continued presence in the general population poses to life, self, staff, other offenders or property;
> - Threat posed by the offender to the orderly operation and security of the facility; and,
> - Regulation of an offender's behavior which was not within acceptable limits while in the general offender population.

(Dkt. 95-8 at 1–2). According to the policy,

> [t]he Department-wide administrative restrictive status housing unit(s) shall provide a controlled setting for those offenders at a facility who have a history of battery on others or who, in the opinion of Department or facility staff, present an extraordinary threat to themselves or others or who present special safety and security concerns (e.g., seriously injuring staff or offenders . . . or having a lengthy history of serious [Class A and/or Class B] disciplinary code violations).

*Id*. at 4.

Inmates are placed in Administrative Department-Wide Restricted Housing when the IDOC central office decides they need to be in a more secure environment, and placement factors include having a high-profile case, causing problems, involvement in a gang, and being involved in contraband movement (Dkt. 95-3 at 13–14). The process to be removed from DWRH-A begins with either a request from the inmate or a caseworker's recommendation during a regular review period. *Id*. at 24–26. A caseworker initiates a behavior management plan and notifies the individual of the requirements to complete to be released from DWRH-A. *Id*. If the inmate complies with the plan, the caseworker makes a recommendation to the unit team manager, who then makes a recommendation to the facility classification department, which then reviews the paperwork and makes a recommendation to the IDOC central office. *Id*.

G Cell House is the restrictive unit at Pendleton and is considered maximum security (Dkt. 95-3 at 32). Inmates in G Cell House are locked up 23 hours per day. *Id*. They also have access to mental health, medical care, library, and law library services. *Id*. at 33. During the Covid-19 pandemic, inmates were allowed recreation once or twice per week and showers every other day. *Id*.

### C.     Mr. Eslick's Restrictive Housing History

Mr. Eslick entered IDOC custody from the Porter County Jail, where his disciplinary history included assault on his cellmate and led to the recommendation that he be placed in DWRH-A for observation and evaluation to facilitate assimilation into the general population (Dkt. 95-7 at 19–21). Mr. Eslick began his time at Pendleton on January 24, 2018, in DWRH-A. He was transferred to DWRH-D at Westville on March 8, 2019 (Dkt. 95-1 at 11-12). On November 12, 2021, he was transferred back from DWRH-D at Westville to DWRH-A at Pendleton upon the Westville warden's recommendation. *Id*. Mr. Hendrix, IDOC's classification director, testified that Mr. Eslick was transferred back to DWRH-A at Pendleton in the hope that a "change in scenery" and working with different correctional staff would lead to better behavior and provide a meaningful opportunity for him to move to a transition unit or the general population (Dkt. 95-7 at 22, 48–49). Mr. Eslick remained in DWRH-A at Pendleton until he was transferred back to Westville on April 18, 2023 (Dkt. 95-1 at 12).

Between March 22, 2018, and November 20, 2022, when Pendleton initiated a request to transfer Mr. Eslick to another facility, Mr. Eslick received more than 80 conduct charges, including dozens of Class A and Class B violations, many of which were for battery (Dkt. 95-9 at 10–37). Class A and B conduct reports are considered major conduct reports that result in consideration for continued placement in administrative restrictive status housing (Dkt. 95-7 at 31–32). On

5

January 29, 2019, then-Pendleton Warden Dushan Zatecky ("Warden Zatecky") wrote a letter to the IDOC Southern Regional Director, Michael Osburn, requesting that Eslick be transferred to DWRH-D for the safety and security of the facility (Dkt. 95-10). In his letter, Warden Zatecky cited Mr. Eslick's 25 major conduct violations since he had arrived at Pendleton in January 2018. *Id*. Mr. Hendrix testified that, because of all the disciplinary charges Mr. Eslick received while in DWRH, when he transferred back to DWRH-A at Pendleton in November 2021, he was due to remain in disciplinary housing for six more years. Despite this, Pendleton officials suspended that time in order to give him an opportunity to transfer facilities, which they hoped would lead to better behavior and transition out of restricted housing (Dkt. 95-7 at 48–50; Dkt. 95-11 at 53).

Warden Reagle testified that each of Mr. Eslick's classification moves was the result of conduct violations (Dkt. 95-3 at 30). During his second stint in DWRH-A at Pendleton, from November 2021 through April 2023, Mr. Eslick received numerous disciplinary charges, including 2 Class C Disfigurement of Body, 4 Class B Impairment of Surveillance, 2 Class B Threatening, 1 Class B Attempted Battery Against Offender, 1 Disruptive or Disorderly Behavior, 3 Class B Security Disruption, 1 Class C Misuse of Medication, and 3 Class B Interfering with Staff charges. (Dkt. 95-9 at 11–15).

D.  **Mr. Eslick's Classification Reviews**

  1.  **Mr. Eslick's First Period in DWRH-A at Pendleton**

During his first stint in DWRH-A at Pendleton of about thirteen months, Mr. Eslick received at least six periodic reviews, including an intake review, 90-day reviews, and an annual review, all of which were conducted by non-party caseworkers (Dkt. 95-11 at 1–7; Dkt. 95-12 at 1–16). The report of Mr. Eslick's first 90-day review, conducted by non-party Chad Evans ("Mr. Evans") on April 25, 2018, indicates Mr. Eslick said, "that he will continue to 'act up' because G

6

Cell House remain conduct clear to be considered for [review of Administrative Restrictive Status Housing] status." *Id*. Mr. Evans reported that Mr. Eslick "refused to answer any more questions and later that night smeared feces around his room." *Id*.

### 2. **Mr. Eslick's Second Period in DWRH-A at Pendleton**

During Mr. Eslick's second period in DWRH-A at Pendleton (about 17 months) Ms. Vckov conducted 7-day reviews on November 17 and 24, 2021, December 7, 14, 22, and 28, 2021, and January 10, 2022, and uploaded her notes into the Offender Case Management System ("OCMS") (Dkt. 95-11 at 58–61). Ms. Vckov conducted 30-day reviews on February 15, March 9, April 6, May 16, June 7, July 6, and August 3, 2022. *Id*. at 62–64. Non-party Emily Sallee ("Ms. Sallee") completed reviews on September 29 and October 27, 2022. *Id*. at 65. As outlined below, Ms. Sallee completed at least five additional reviews of Mr. Eslick's status during this second period.

Ms. Vckov's July 2022 review reads:

> Offender Eslick was admitted to G Cell House on 11/12/2021 as DWRHSU-A-IS3 from WCU. Offender will remain on DWRHSU-A-IS3 until he meets DW criteria to be released from DW status. He was seen by mental health, and they determined he did not meet SMI criteria while in RSHU. We discussed hygiene, legal, mail, law library, mental health, medical, and unit team services. The offender had a chance to address any other questions concerns or issues at this time. Offender's last A or B conduct report was on 02/02/2021 with a B235 fleeing/resisting and received a C304 on 02/01/2022. Offender completed the anger management packet and completed phase 4 of the ACT program but needs to complete 6 months at a stepdown facility to be a successful graduate.

*Id*. at 64 (cleaned up).

Her August 2022 review is mostly the same, but it additionally notes that "Offender completed the anger management packet and completed phase 4 of the ACT program but needs to complete 6 months at a stepdown facility to be a successful graduate. Offender needs to focus on his mental health and reach out to Ms. Husar for help with packets and information." *Id*. (cleaned up).

7

Seven of her reviews included language informing Mr. Eslick, "To be eligible for release, you must have at least 9 months at this facility and be A & B conduct clear for 1 year and C & D conduct clear for 9 months." (Dkt. 95-12 at 41, 43, 45, 47, 49, 50, 51, 53, 55, 56). In the year preceding October 21, 2022, Mr. Eslick received three Class C and eight Class B conduct reports. *Id*. at 23. Ms. Sallee's October 2022 report says:

> Offender Eslick was admitted to G Cell House as DWARSH from WCU on 11/12/2021. Offender Eslick has 0 separate in the system. He is not labeled as STG in OIS. His last guilty conduct was B236 on 9/8/2022. He has A111 and B236 pending. He was placed on DW status due major conducts. He was reviewed by mental health and they determined he did not meet SMI criteria in RSHU. We discussed hygiene, legal, mail, law library, mental health, medical, and unit team services. His next review is scheduled for 12/9/2022.

Dkt. 95-11. at 65 (cleaned up).

On October 21, 2022, Joshua Shaver, the unit team manager, sent a letter to Warden Reagle requesting that Mr. Eslick be transferred to the Wabash Valley Correctional SHU for long-term segregation in the interest of facility safety and security (Dkt. 95-12 at 23–24). Mr. Shaver's letter referred to 11 conduct charges Mr. Eslick had amassed between November 21, 2021, and October 21, 2022, plus two other then-pending conduct reports. *Id*.

On October 27, 2022, Mr. Eslick filed a classification appeal to unit team manager Mr. Greathouse, and Mr. Greathouse responded that "[a]ll DWARSH-A appeals must be sent to central office," and provided the address (Dkt. 95-12 at 33). In November 2022, Pendleton initiated a request to transfer Mr. Eslick to DWRH-D. Warden Reagle signed the request, along with the assistant superintendent, unit manager, STG coordinator, custody manager, casework manager, and counsel, all of whom recommended the transfer. *Id*. Ms. Sallee's November 28 review indicated that Mr. Eslick was pending transfer to DWRH-D (Dkt. 95-11 at 66). Her December 28 review stated, "at this time, Eslick is pending transfer to another DWRSH-A facility per Central

8

Office. The transfer is to see if Eslick's behavior will improve at another facility." *Id*. On December 30, non-party Paula Dickson's Report of Classification Hearing indicated Mr. Eslick was recommended for transfer because of his continued misconduct and inability to adjust to Pendleton (Dkt. 95-12 at 26).

Ms. Sallee's January 13, 2023, review listed Mr. Eslick's ten conduct violations within the prior six months and reviewed all of his evaluation results related to his classification (Dkt. 95-11 at 66–67). Ms. Sallee conducted additional reviews on January 27, February 27, and March 28, 2023, before Mr. Eslick's transfer to DWRH-D at Westville. *Id*. at 68. All three reviews included the following language:

> At this time, ofd [sic]. Eslick is pending transfer to another DWRSH-A facility per Central Office.
>
> Offender Eslick was admitted to G Cell House as DWARSH from WCU on 11/12/2021. Offender Eslick has 0 separate in the system. He is not labeled as STG in OIS. His last guilty conduct was B209, B252 X3, B236 X2, and C304 X2. He was placed on DW status due major conducts. He was reviewed by mental health, and they determined he did not meet SMI criteria in RSHU. Offender Discussed the following issues and/or concerns: transfer

*Id.* (cleaned up)

Mr. Eslick testified that when Ms. Vckov performed 30-day reviews, she would take the review to his cell and give him an opportunity to review it and ask questions (Dkt. 95-1 at 17–18). Ms. Vckov testified that, in performing the 30-day reviews, she would review the information in the Offender Information System ("OIS") and OCMS notes, as well as other documents as needed. (Dkt. 95-4 at 7–8). She would then take the completed review to Mr. Eslick's cell and, after his review, log the review into an internal system from which the classification staff would submit it to the IDOC Central Office. *Id.*

9

Mr. Eslick also testified that on November 27, 2021, he wrote a letter to Mr. Greathouse requesting a reason for his continued assignment to DWRH-A and did not receive a response (Dkt. 95-1 at 21–22). He also testified that he requested a 90-day review but did not receive a response from Mr. Greathouse. *Id.*

E. **Defendants' Personal Involvement**

Mr. Goodnight and Mr. Solomon contend that they had no personal involvement in Mr. Eslick's classification reviews. Mr. Goodnight testified that Mr. Eslick was never assigned to his caseload (Dkt. 95-5 at 1). Mr. Solomon testified that, although he was assigned inmates from G Cell House, Mr. Eslick was never assigned to his caseload, and he never dealt with Mr. Eslick's classification (Dkt. 95-6 at 14). However, Mr. Eslick testified that on one occasion both Mr. Solomon and Mr. Goodnight filled in for another caseworker in performing a periodic review (Dkt. 95-1 at 19).

III.    **DISCUSSION**

At all times between January 24, 2018, through at least the filing of his Amended Complaint on September 16, 2024, Mr. Eslick was placed on either DWRH-A or DWHR-D status.[1] At all times relevant to Mr. Eslick's claims, he would be in his cell for a period of 23 hours out of every day, and even the 1 hour per day of what was supposed to be recreational time was not "offered" to Mr. Eslick. (Dkt. *95-3* at 32:19-33:4). Mr. Eslick contends that this is inhumane treatment, and Defendants' Motion for Summary Judgment should be denied on the basis that his constitutional right to a meaningful review of his prolonged classification in solitary confinement has been violated. (Dkt. 103 at 18). He argues that the designated evidence shows the IDOC's own policies regarding meaningful and periodic reviews were not followed, that he was not afforded

---

[1] But as noted above, the reviews of his status in DWRH-D at Westville are not at issue in this case.

meaningful and periodic reviews, and that his Fourteenth Amendment Due Process claims should proceed because there is a genuine issue of material fact as to whether his constitutional rights were violated as a result of his prolonged incarceration in solitary confinement (Dkt. 103 at 2).[2]

The Defendants argue at the outset that some of them cannot be liable because they had no personal involvement with Mr. Eslick's classification reviews. But Defendants' primary argument on summary judgment is that they provided Mr. Eslick adequate reviews within the bounds of the Fourteenth Amendment. Alternatively, they maintain that they are entitled to qualified immunity because their actions did not violate a clearly established right. The Court will address each argument in turn.

### A.     Questions of fact remain regarding the personal involvement of the Defendants.

"'To recover damages under [42 U.S.C.] § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.*

Pendleton caseworkers Mr. Goodnight and Mr. Solomon argue that they are entitled to summary judgment because they were not involved in Mr. Eslick's classification reviews (Dkt. 96 at 19). Although Mr. Eslick testified that each of them participated in one review, both deny this, and the other evidence in the record does not indicate they had any personal involvement. Mr. Eslick's response does not expressly address this argument (Dkt. 103).

But the Defendants' argument is premised on their contention that Mr. Eslick's uncorroborated deposition testimony alone is insufficient to create a dispute of material fact. That is not correct. As the Seventh Circuit has pointed out, it is not the self-serving or uncorroborated

---

[2] Eslick does not argue that his Fourteenth Amendment due process rights were violated by any disciplinary charge or sentence received at the disciplinary hearings.

nature of affidavits or deposition testimony that prevents them from defeating summary judgment. Rather, testimony "fail[s] to thwart summary judgment because [it is] not based on personal knowledge as required by both the Federal Rule of Civil Procedure on summary judgment, Rule 56(e) ('[s]upporting and opposing affidavits shall be made on personal knowledge'), and by Federal Rule of Evidence 602 ('A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.')." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). The Defendants do not argue that Mr. Eslick lacks the necessary personal knowledge to support admission of his testimony, and given the substance of the testimony, he clearly does. Accordingly, Mr. Goodnight and Mr. Solomon are not entitled to summary judgment for lack of personal involvement.

**B.     The Defendants are entitled to summary judgment on Mr. Eslick's Fourteenth Amendment claims.**

"Inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). "Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983). "Prison officials must engage in some sort of periodic review of the confinement of such inmates." *Id.*

Due process does not require periodic reviews to be formal or adversarial. *Id.* at 472. Inmates are not ordinarily entitled to present evidence or statements. *Id.* at 477 n.9. Rather, periodic reviews must be "meaningful," which is to say they must be "open to the possibility of a different outcome." *Isby v. Brown*, 856 F.3d 508, 527–28 (7th Cir. 2017). Periodic reviews must "provide helpful notice . . . as to the reasons for [an inmate's] placement and how he could get out." *Id*. at 527**.** Reviews may not be mere "meaningless, repetitive, and rote response[s]" and must look to

12

present and future conduct, as well as past. *Id*. at 527 (internal quotations and citation omitted). Reviewers may not merely "go through the motions of conducting a review when they had developed a pre-review conclusion . . . no matter what the evidence showed." *Id.* at 529.

Following *Isby*, a trial court in this circuit found no Fourteenth Amendment violation when a prisoner spent slightly more than five years in administrative confinement, despite improved conduct, because reviews were truthful and gave "clear notice of the reason for his continued placement." *Kimble v. Boughton*, No. 19-CV-645-SLC, 2021 WL 3809904, at *17 (W.D. Wis. Aug. 26, 2021). In *Wallace v. Jeffreys*, another court in this circuit found that reviews recommending continued administrative detention after nine years in segregation, when based on new misconduct, refusal to participate in the review process, and "continued negative adjustment," met Constitutional standards. , No. 17-CV-576-DWD, 2023 WL 2138337, at *20 (S.D. Ill. Feb. 21, 2023).[3] The Defendants argue the evidence outlined above leaves no dispute that Mr. Eslick received sufficiently frequent and meaningful reviews of his placement to satisfy due process (Dkt. 96 at 16–18).

1. **The frequency of Eslick's classification reviews satisfies due process requirements.**

Mr. Eslick maintains that Ms. Vckov did not follow IDOC policy regarding the timeliness of his reviews (Dkt. 103 at 14). He argues that "IDOC policy was created to provide meaningful reviews at least every 7 days for the first sixty days of confinement in DWRH-A and every 30 days after that. This policy was simply not followed by Ms. Vckov, and Mr. Eslick's rights were violated when timely reviews were not conducted." *Id.* at 15.

---

[3] A later review, when the same inmate had not received a misconduct report in over two years, however, resulted in recommendations based on a general, dated history of violent or aggressive behavior that a jury could find cursory. *Id*. at 21.

13

Due process does not require custodians to conduct their periodic reviews according to rigid timelines. "The periodic review need only be sufficiently frequent that administrative segregation does not become 'a pretext for indefinite confinement of an inmate.'" *Westerfer*, 682 F.3d at 686 (quoting *Hewitt*, 459 U.S. at 477, n.9). Otherwise, the frequency of periodic reviews "is committed to the discretion of the prison officials." *Isby*, 856 F.3d at 525. As discussed above, the undisputed record shows that Mr. Eslick received regular periodic reviews that set forth a path for him to transition out of restrictive housing. Minor delays in conducting those reviews and gaps of up to two months did not violate Mr. Eslick's Fourteenth Amendment rights. *See Mockbee v. Dugan*, No. 2:20-CV-00536-JPH-MG, 2023 WL 6382599, at *5 (S.D. Ind. Sept. 29, 2023) (six meaningful reviews in one year with a gap of four months did not violate plaintiff's rights).

By the time the transfer process to another facility began in October 2022 (a cumulative period of approximately 25–26 months), Mr. Eslick had received at least 22 reviews during his time at Pendleton. The frequency and number of his status reviews satisfy due process requirements.

**2. Eslick's classification reviews were meaningful.**

Mr. Eslick argues that the reviews of his status—specifically noting Ms. Vckov's—were "illusory in nature and had no bearing on whether Mr. Eslick would or would not remain in solitary." (Dkt. 103 at 15). The undisputed record evidence does not support this contention.

**a. Noting misconduct longer than six months preceding the reviews does not render them illusory.**

Mr. Eslick argues that some of his classification reviews considered conduct reports older than the three-to-six-month period preceding the review and thus did not meaningfully consider whether there had been a "substantial change" in his conduct. In support, he claims that Warden Reagle testified that the facility looked to three- and six-month review periods for behavior but

Ms. Vckov improperly used nine- and twelve-month periods. *Id*. at 16. Mr. Eslick argues that because of this improper use of nine- and twelve-months periods, so long as he had a serious conduct violation in the previous year, Ms. Vckov would improperly deny any request for release and perpetuate a sham review process. *Id*. at 16–17.

There are at least two problems with this argument. First, Warden Reagle actually testified that although a three- or six-month period is a typically reasonable amount of time to show a substantial change in behavior, "[d]epending on how serious the conduct is, it may also change the timeframe from, you know three months to six months to possibly even a year, but those are usually the timeframes that we look at." (Dkt. 95-3 at 31–32). Second, and more important, the look-back period for conduct violations is committed to the discretion of prison officials. The look-back period offends due process only where reviews fail to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale by repeatedly relying on misconduct so old that it becomes "a pretext for indefinite confinement." *Hewitt*, 459 U.S. at 477 n.9.

Unlike the plaintiff in *Isby*, who went nearly five years between major infractions, Eslick did not remain conduct clear for any significant period during his time in restrictive housing. *See* 856 F.3d at 515. Between March 22, 2018, and November 20, 2022, Eslick received more than 80 conduct charges, including dozens of Class A and Class B violations, many of which were for battery (Dkt. 95-9 at 10–37). The reviews also note the recency of Mr. Eslick's misconduct. Ms. Sallee's October 2022 review noted that Mr. Eslick's last guilty conduct was in September 2022 for a Class B charge and that he had a Class A and Class B charge pending (Dkt. 95-11 at 65). Mr. Shaver's October 2022 letter indicated that Mr. Eslick had received three Class C, eight Class B, and one Class A conduct report in the previous year (Dkt. 95-12 at 23). Mr. Eslick does not dispute

15

any of the disciplinary charges reported in his reviews. The undisputed facts do not support the conclusion that the Defendants improperly ignored a "substantial change" in his conduct, because Mr. Eslick continued to commit misconduct throughout his segregation.

### b. **Repetition of language in some written reviews accurately reflects the frequent and continuing nature of Eslick's conduct violations.**

Because of their repetitious language, some of Mr. Eslick's written reviews, particularly those by Ms. Vckov, may appear *pro forma*, but the reviewers' statements are not the mere "rote repetition" disapproved by *Isby*. 856 F.3d at 528. Mr. Eslick has not disputed the evidence that reviewers consistently sought to apprise him of the objective requirements to transition out of restrictive housing. For example, at least twelve reviews explained that "[t]o be eligible for release, you must have at least 9 months at this facility and be A & B conduct clear for 1 year and C & D conduct clear for 9 months." (Dkt. 95-12 at 41, 43, 45, 47, 49, 50, 51, 53, 55, 56, 57, 59). Providing Mr. Eslick a path out of segregation required the reviews to repeat those requirements, because his ongoing conduct violations did in fact prevent him from transitioning out of restricted housing. In reiterating the conduct requirements to be considered for transition out of restrictive housing, Defendants were not merely "rehashing" Mr. Eslick's initial or long-ago misconduct but were appropriately looking at his current and future conduct. *Id*. at 528 (quoting *Proctor v. Leclaire*, 846 F.3d 597, 611 (2d Cir. 2017)). Despite the sometimes-repetitious language, Mr. Eslick's reviews were truthful and "provide[d] helpful notice . . . as to the reasons for [his] placement and how he could get out." *Isby*, 856 F.3d at 527. Moreover, in noting Mr. Eslick's completion of an anger management program and the requirement he do six months at a stepdown facility, Ms. Vckov's reports included new language to reflect that development. *See Isby*, 856 F.3d at 527 ("Even one or two edits or additions . . . could assuage our concerns and provide helpful notice. . . .").

Ms. Vckov's reports also reflect wide-ranging discussions with Mr. Eslick during her reviews that go beyond his disciplinary history, including anger management and mental health recommendations, his continuing displeasure at losing the television he had purchased, and opportunities to ask questions, which he refused to do on several occasions. (*See* dkt. 95-12 at 39, 41, 43, 47, 49, 50, 51, 53, 57, 59).

### c. Additional undisputed evidence demonstrates that Eslick's reviews were meaningful.

Mr. Eslick does not dispute the repeated reports that he refused to engage with his reviewers, thereby forestalling discussion that might have led to more robust reports. Given Mr. Eslick's undisputed ongoing misconduct, reviewers' attempts to discuss other relevant matters such as mental health, and his refusals to engage with those reviewers, Defendants' periodic reviews go beyond the "meaningless, repetitive, and rote response," present in *Isby*. 856 F.3d at 527 (quoting *Toevs v. Reid*, 685 F.3d 903, 913-14 (10th Cir. 2012)). *See also Wallace*, 2023 WL 2138337, at *20 (finding that reviews based on new misconduct, failure to adjust, and refusal to participate in review process were meaningful).

Several of the reviews Mr. Eslick received indicate that the Defendants (and other personnel) also considered the possibility that transferring Mr. Eslick to another facility could be a way forward for him. Following a November 2022 recommendation to transfer Mr. Eslick to DWRH-D signed by seven different facility officials, reviews by non-party caseworkers all stated that Mr. Eslick was being transferred because of his inability to adjust to Pendleton and "to see if Eslick's behavior will improve at another facility." (Dkt. 95-12 at 26, 33, 66).

The Defendants' reviews of Mr. Eslick's administrative segregation not only demonstrated "the possibility of a different outcome," *Isby*, 856 F.3d at 527–28, but they also set forth the objective requirements for Mr. Eslick to transition out of administrative segregation and, when he

17

consistently failed to follow that guidance, Defendants sought an opportunity for him to have a "fresh start" at another facility, which they were able to secure for him (Dkt. 95-7 at 48–50; Dkt. 95-11 at 66; Dkt. 95-12 at 23-25).

Mr. Eslick's long-term confinement in restrictive housing is certainly troubling. The record suggests that—for reasons not clear to the Court—he may not have had access to necessary mental health care beyond basic anger management counseling, as was recommended by multiple reviewers. Because Mr. Eslick's healthcare history is not reflected in the record and these Defendants were not responsible for providing him mental health services, Mr. Eslick's mental health care (or lack thereof) is not before the Court. But the Court recognizes the unfortunate reality that prolonged administrative segregation is likely to exacerbate the mental health challenges suggested by the record and, untreated, lead to additional misconduct. Nevertheless, because the undisputed facts demonstrate that Mr. Eslick was afforded regular and meaningful review of his restrictive housing placement, the Defendants are entitled to summary judgment.

**C.**     **The Court need not address the Defendants' qualified immunity argument.**

The Defendants have also raised a qualified immunity defense in their summary judgment motion (Dkt. 96 at 19–21). Because they are entitled to summary judgment on other grounds, the Court need not address this defense.

**D.**     **Mr. Eslick is not entitled to injunctive relief.**

Similarly, because the undisputed record shows that Mr. Eslick received regular and meaningful review of his restrictive housing assignment, he is not entitled to the injunctive relief he seeks because there is no evidence that he is suffering any ongoing deprivation of his Fourteenth Amendment rights.

## IV. CONCLUSION

Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, nonetheless, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84–85 (1987). Having carefully evaluated the designated evidence and drawing all reasonable inferences from it in the light most favorable to Mr. Eslick, for the reasons stated above, Defendants' Motion for Summary Judgment, Dkt. [94] is **GRANTED**.

Final judgment shall issue by separate Order.

The Court greatly appreciates the efforts of recruited counsel, Daniel Gore, in this case.

**IT IS SO ORDERED**

Date: 9/30/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

RYAN LEE ESLICK
121550
INDIANA STATE PRISON
Electronic Service Participant – Court Only

All electronically registered counsel of record